UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )   CAUSE NO.: 2:21-CR-7-JTM-JEM |
| | ) |
| FRANK STORK, | ) |
|     Defendant. | ) |

**FINDINGS, REPORT, AND RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE PURSUANT TO
28 U.S.C. § 636(b)(1)(B) & (C)**

This matter is before the Court on Defendant's Motion to Suppress Evidence [DE 25], filed May 24, 2021. Defendant requests that all property seized from Stork's car, all observations made by officers, and all statements made by Stork in connection with a traffic stop made on January 3, 2021, be suppressed. On July 30, 2021, Judge James T. Moody entered an Order [DE 34] referring this matter to the undersigned Magistrate Judge for a report and recommendation on the instant motion pursuant to 28 U.S.C. § 636(b)(1)(B). This Report constitutes the undersigned Magistrate Judge's combined proposed findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C).

Finding that there was probable cause for the initial traffic stop and that the search of Defendant's vehicle was a proper automobile search, the Court recommends that the District Court deny the Motion to Suppress.

**I.   Background**

Defendant Frank Stork is charged by way of a single count indictment, filed January 21, 2021, charging him with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).

On May 24, 2021, Defendant filed the instant motion to suppress the evidence seized from

1

his vehicle during a traffic stop and search of his vehicle, the Government filed a responsive brief on June 4, 2021, and Defendant filed a reply brief on July 16, 2021. On July 30, 2021, District Court Judge Moody referred the motion to the undersigned Magistrate Judge to conduct a hearing on the motion. On October 13 and 19, 2021, the Court held an evidentiary hearing on the motion. On November 29, 2021, Defendant Stork filed Defendant's Memorandum in Support of Suppression Motion, and the Government filed a post-hearing brief in opposition to the motion on December 13, 2021. Thereafter, at Defendant's request, additional briefing was filed, including Defendant's supplemental briefing on December 16 and December 28, 2021, and the Government's responsive supplemental briefing on January 3 and January 20, 2022. Defendant filed additional briefing, without leave of court, on February 4, 2022.

## II.   Testimony

Defendant Frank Stork testified that he stopped at a Speedway gas station on the south side of Mississippi Street in Hobart, Indiana for coffee at 10:22 a.m. on January 3, 2021. Tr. 14 [DE 54]. Mr. Stork testified that the Speedway gas station video (Exhibit A) shows his Durango exiting the Speedway parking lot on to Mississippi Street with the taillight flashing, indicating he was signaling a left turn. Tr. 18-22 and 23-24. Exhibit B, a video from the Days Inn where the stop at issue occurred, was played, and showed Mr. Stork's vehicle pulling into the Days Inn lot, followed by several police vehicles, one of which pulled in front of Mr. Stork's vehicle in the entrance lane of the motel parking lot. Tr. 26-28. Mr. Stork testified that his vehicle was stopped for approximately ten seconds before the police vehicle pulled in front of his vehicle. Tr. 30, 34. Mr. Stork also testified that after he pulled into the motel parking lot and stopped, a police officer from the police vehicle to the rear of Mr. Stork's vehicle exited his vehicle, pulled his weapon, and

2

approached Mr. Stork's driver side door. Tr. 34.

Exhibit B shows that at nine seconds into the video, both Mr. Stork's vehicle and the police vehicles are all facing the camera. Tr. 36-37. From fourteen seconds to twenty-four seconds, the back police vehicle comes around Mr. Stork's vehicle in order to become perpendicular in front of his vehicle. Tr. 37-38. At twenty-two to twenty-four seconds, the officer from the vehicle to the rear of Mr. Stork's vehicle is exiting his vehicle and drawing his weapon, he then waits for the officer from the front vehicle to exit his vehicle, and they simultaneously approached his driver and passenger side doors, with their weapons drawn. Tr. 39-40. Both officers directed him to put his hands on the steering wheel. Tr. 40.

At one minute and nine seconds into the video, the officer on Mr. Stork's driver's side partially enters Mr. Stork's vehicle. Tr. 44. Mr. Stork testified that between the time the officers approached his door, and he was removed from the vehicle, Officer Havens (the officer on the driver's side) had punched him in his eye, accused him of having something in his mouth, and began choking him. Tr. 44. Mr. Stork further testified that Officer Shaginaw (the officer on the passenger side) tased him during that time. Tr. 44. Mr. Stork testified he was then pulled from the car and shoved to the concrete. Tr. 44. Mr. Stork further testified that Officer Havens punched him again, grabbed his arms, and put a knee over his face while Mr. Stork was on the ground. Tr. 45. Mr. Stork testified that a police canine was biting his leg at one minute and thirty-nine seconds into the video. Tr. 46. Mr. Stork testified that he was not told why he was stopped, nor was he asked for his license or registration. Tr. 53-54.

Mr. Stork testified that he was taken by ambulance to St. Mary's Hospital and treated for a dog bite and a black eye, as well as being given a CAT scan for head injuries. Tr. 54.

On cross examination, Mr. Stork testified that a different camera at the Speedway (Truck Island camera) showed his vehicle exiting the Speedway and that he had already made his turn so his turn signal was no longer flashing. Tr. 55-57. He testified that he did not see any police vehicles behind him until he pulled into the Day's Inn parking lot. Tr. 58. He testified that he did not activate his turn signal 200 feet before the intersection of Mississippi and 62nd Street. Tr. 60.

Mr. Stork testified that while he was driving from the Speedway until he was pulled over, he did not reach into the back seat of his vehicle. Tr. 67, 68. Mr. Stork testified that the officers never requested that he get out of the vehicle. Tr. 67. Mr. Stork testified that he denied having anything in his mouth when the officer asked him while he was still in the car, and that that was when the officer began choking him. Tr. 68.

Mr. Stork testified that between the stop sign at Mississippi and 62nd Street where he turned and the Days Inn parking lot, he did not know if there were safe spots to pull over. Tr. 71. He testified that he did not see or hear police vehicles until right before he pulled into the Days Inn parking lot, and that he stopped as soon as he realized that. Tr. 62, 72, 73. Mr. Stork estimated that he traveled approximately 50 feet into the Days Inn parking lot before he stopped. Tr. 72.

Mr. Stork testified that the windows (except the windshield) of his vehicle are tinted and that someone on the outside would not be able to see what he was doing on the inside of the vehicle. Tr. 68, 73-74. Mr. Stork denied driving with his window open. Tr. 67.

Officer Jared Havens, a Hobart Indiana Police Officer, testified that he was working on a hotel patrol detail on January 3, 2021. Officer Havens was in uniform, driving a marked police vehicle. Tr. 88 [DE55 Transcript, day 2]. Officer Havens testified that Corporal Shaginaw radioed him and advised that Corporal Shaginaw wanted Officer Havens to watch a black Dodge Durango

4

which was parked at the Speedway south at that time. Tr. 89. Officer Havens watched the Durango exit the Speedway south lot onto Mississippi Street and testified that it did not use a turn signal when doing so. Tr. 90. Officer Havens began following the Durango. Tr. 91. Officer Havens testified that the Durango had tinted windows, and the driver's side window was "half cracked down." Tr. 91. Officer Havens saw the Durango turn onto 62nd Street from Mississippi and activate its turn signal while stopped at the stop sign at that intersection Tr. 91-92. Officer Havens testified he then activated his lights to pull the Durango over, but the Durango did not pull over, and instead turned into the Days Inn parking lot. Tr. 92. Officer Havens testified that the Durango was "slow rolling" in the Days Inn parking lot. Tr. 92. Officer Havens then used his siren. Tr. 92-93. Officer Havens testified that the Durango continued to slow roll for approximately two to three hundred feet into the Days Inn parking lot. Tr. 93.

Officer Havens testified that during the time the Durango was slow rolling, he could see the driver, through the rear window and by looking in the driver's side mirror through the partially open driver's side window, reaching over to the passenger side of the vehicle. Tr. 94-95. Officer Havens testified that the driver reached toward the area behind the passenger seat three times during the time he was slow rolling. Tr. 96. Officer Havens testified that, in his experience, such activity indicates that the driver may be reaching for something, possibly a weapon. Tr. 96. Officer Havens and Corporal Shaginaw, whose police vehicle was now in front of the Durango, both exited their vehicles with their weapons drawn, and began commanding the driver to pull his hands on the wheel. Tr. 96. The driver did so after several commands. Tr. 96.

Officer Havens testified that at this time he could see the driver chewing on something which was causing foam to come from the sides of his mouth. Tr. 97. Officer Havens and Corporal

5

Shaginaw both began yelling for the driver to spit out whatever he had in his mouth, and to exit the vehicle. Tr. 97. Officer Havens testified that the driver failed to do so. Tr. 97. Officer Havens testified that he and Corporal Shaginaw opened the doors of the Durango, and Corporal Shaginaw advised the driver that he was going to deploy his taser and did so. Tr. 98-99. At that time, Officer Havens was able to pull the driver from the vehicle by his left wrist. Tr. 99. Officer Havens was attempting to get control of the driver's legs while Corporal Shaginaw was trying to get control of his arms. Tr. 100. Officer Havens testified he then remotely opened the back door of his police vehicle and ordered his canine partner to exit the vehicle. Tr. 101. Canine York was then given the command to apprehend, which he did by biting the leg of the driver. Tr. 101-102. Officer Havens testified that Corporal Shaginaw was able to get a handcuff on one wrist of the driver, but they were unable to completely handcuff him until other Hobart Police officers assisted. Tr. 103. Officer Havens cited Mr. Stork for failing to use his turn signal at the intersection of 62nd Street and Mississippi but did not issue any other citations. Tr. 103.

On cross-examination, Officer Havens testified that upon approaching the vehicle window, he did not ask the driver for identification, but instead ordered him to put his hands on the steering wheel. Tr. 119. Officer Havens testified that during the time he and Corporal Shaginaw were attempting to get Mr. Stork out of the vehicle he did not see any gun or drugs in the vehicle, on the ground, or in Mr. Stork's hands. Tr. 123-126.

Scott Shaginaw, a former Hobart Indiana police corporal, testified that on January 3, 2021, he was also working the hotel detail in the 61st and Mississippi area. Tr. 135-136. He was driving a marked police vehicle and wearing a uniform. Tr. 137. Mr. Shaginaw testified that he was slowly driving past the Key West Inn parking lot in order to observe a vehicle in that parking lot when he

6

noticed a black Dodge Durango driving very slowly in the oncoming direction. Tr. 138. The Durango was also of interest as there had been a recent uptick in carjackings and thefts of Dodge vehicles. Tr. 139. Mr. Shaginaw radioed Officer Havens that the Durango had pulled into the Speedway south and to watch it to see if it got on the highway or stayed in the area. Tr. 142. Mr. Shaginaw testified that the Durango exited the Speedway south, went to the McDonalds drive through, left without ordering anything, and returned to the Speedway south, which he thought was odd. Tr. 143. After the Durango pulled on to Mississippi, Mr. Shaginaw drove behind Officer Havens' vehicle behind the Durango. Tr. 147. Officer Havens advised Mr. Shaginaw that he was going to pull the Durango over failing to signal the turn on 62nd Street. Tr. 147. Mr. Shaginaw testified that Officer Havens turned on his lights as the Durango was turning on 62nd Street and the Durango continued to go very slowly on 62nd, until it turned into the Days Inn parking lot, and continued slowly moving for about 75 yards. Tr. 147. Mr. Shaginaw estimated that the total distance the Durango proceeded slowly between the time the lights were activated and it stopped was about 150 yards. Tr. 148. Mr. Shaginaw heard Officer Havens' intermittent siren and saw lights throughout that time. Tr. 149.

Mr. Shaginaw testified that after he pulled his police vehicle around in front of the Durango, he exited his vehicle and was able to see through the windshield of the Durango to see the driver "leaning back and behind the passenger's front seat". Tr. 148-149. Mr. Shaginaw then loudly ordered the driver to show his hands. Tr. 149-150. When the driver put his hands on the steering wheel, Mr. Shaginaw opened the passenger door and saw the driver was chewing something. Tr. 150. Mr. Shaginaw testified the driver removed his hands from the steering wheel and reached near the console, and Mr. Shaginaw was trying to push his hands away from there.

7

Tr. 152-153. Mr. Shaginaw then tasered the driver, and the officers were able to remove him from the vehicle. Tr. 153.

Mr. Shaginaw testified that in 75-80% of cases where a traffic stop involved a driver who slow rolled or reached around inside the car during the stop, criminal activity was uncovered. Tr. 159-160.

After Mr. Stork was taken away in the ambulance, his vehicle remained in the driving lane of the Days Inn parking lot. Tr. 161-162. Police performed a search of the car, during which Mr. Shaginaw saw the battery compartment with the gun inside. Tr. 178-179.

Officer James Medwetz, a Hobart Indiana police officer, assisted in the arrest and search of the vehicle. He found the compartment under the passenger seat, and upon opening it, saw a handgun in the compartment. Tr. 189.

### III. Analysis

Stork asks the Court to suppress evidence seized, statements made, and observations made during or as a result of the traffic stop. He asserts that the traffic stop itself was invalid and argues that the search of the Durango was not incident to an arrest and the search cannot be classified as a proper inventory search. The Government raises an additional basis for the search being permissible: the automobile exception. The Court will address each argument in turn.

A) Reasonableness of initial stop

For a vehicle stop to be constitutional, it must be "reasonable" under the Fourth Amendment. U.S. Const. amend. IV; *Delaware v. Prouse*, 440 U.S. 648, 663 (1979). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred," *Whren v. United States*, 517 U.S. 806, 810 (1996),

and "[p]robable cause exists when 'the circumstances confronting a police officer support the reasonable belief that a driver has committed even a minor traffic offense.'" *United States v. Muriel*, 418 F.3d 720, 724 (7th Cir. 2005) (quoting *United States v. Cashman*, 216 F.3d 582, 586 (7th Cir.2000). "Probable cause is an objective standard, based on the totality of the circumstances. If an officer reasonably thinks he sees a driver commit a traffic infraction, that is a sufficient basis to pull him over without violating the Constitution." *United States v. Simon*, 937 F.3d 820, 828–29 (7th Cir. 2019), cert. denied, 140 S. Ct. 824 (2020). Indeed, "[w]hether the driver actually committed a traffic infraction is irrelevant for Fourth Amendment purposes so long as there was an objective basis for a reasonable belief he did." *United States v. Lewis*, 920 F.3d 483, 489 (7th Cir. 2019).

In this case, Officer Havens testified that he saw a black Dodge Durango exit a Speedway gas station onto Mississippi without using its turn signal, and later turn onto 62nd Street from Mississippi while turning on its turn signal as it began the turn. The Indiana Code requires that vehicles activate turn signals 200 feet before turning. Indiana Code §9-21-8-25. However, an Indiana court has held:

> Police officers did not have probable cause to effect traffic stop of defendant based on alleged violation of statute requiring turn signal to be used not less than 200 feet before turn, where evidence indicate that presence of another street less than 200 feet before street defendant turned unto would mean that compliance with status would confuse other motorists. State did not show that it was possible for defendant to comply with statute, and officer testified that defendant turned his signal on about 150 feet before turning.

*State v. Rhodes*, 950 N.E.2d 1261 (Ind. Ct. App. 2011). In this case, there were driveways within 200 feet of the stop sign at 62nd and Mississippi. Officer Havens testified that Mr. Stork turned his turn signal on at the time he began his turn onto 62nd.

9

Defendant argues that the Government has not met its burden of proving that the officer stopped Stork based on an objectively reasonable belief he was in violation of Indiana traffic law at the time of the stop. Defendant argues that Stork was in compliance with the Indiana Code because he signaled his turn out of the Speedway lot and signaled his turn on 62nd Street when it would not be confusing to other motorists to do so, even though it was less than 200 feet before the turn. However, Officer Havens testified that Stork did not signal his turn out of the Speedway lot at all and initiated his signal when stopped at the intersection of 62nd and Mississippi. The late turn signal at 62nd Street and Mississippi is admitted by Defendant, although he offered the excuses of motorist confusion and insufficient distance.

Accordingly, the officer had probable cause to believe that Defendant did not activate his turn signal within 200 feet of beginning his turn onto 62nd Street from Mississippi, as required by Indiana Code § 9-21-8-25. The Court concludes that "the circumstances confronting a police officer support the reasonable belief that a driver has committed even a minor traffic offense," and therefore that there was probable cause for Officer Havens to stop Defendant Stork. *Muriel*, 418 F.3d at 724. Therefore, the stop was constitutionally reasonable and suppression of evidence arising from the stop is not warranted on this basis.

B) <u>Exceptions to warrantless searches</u>

Although only an inventory search argument was raised by the Defendant, the Government argues that the search of Defendant's vehicle following his arrest satisfies two exceptions to the general rule that warrantless searches are unreasonable: the automobile exception and the inventory search exception.

Defendant argues that the search of his vehicle after his arrest was not a proper inventory

10

search as the officers did not comply with the Hobart Police Department's inventory search procedures by not producing an Impound Report or Inventory List, and therefore that anything obtained as a result of that search should be suppressed. For an inventory search to be constitutional it must comply with standard police procedures, *Anderson v. State*, 64 N.E. 3d 903, 908 (Ind. Ct. App. 2016), but Defendant argues that the Hobart Police Department does not mandate that all compartments in a vehicle be searched during an inventory search, and therefore no compartments should have been searched, citing to *Florida v. Wells*, 495 U.S. 1 (1990). Defendant argues that if the inventory search was not properly conducted, any evidence obtained from the vehicle during the search was removed improperly and should be suppressed.

The Government argues that Defendant's vehicle would have been towed since he had been arrested and the vehicle was in the middle of a driving lane in a parking lot. The Government also argues that it is standard in an inventory search for all compartments in a vehicle to be searched. The Government agrees that a tow inventory form must be completed as part of that process but does not respond to the argument that the Hobart Police Department's procedures were not properly followed because that form was not completed. They do not attach, nor did they produce in evidence at the suppression hearing, any such form.

An inventory search would have been proper and appropriate to be conducted at the time of Defendant's arrest, and that search would have included all compartments; as a result, the gun would have been found. The Government has not met its burden of proving that the search the officers conducted on Defendant's vehicle complied with the Hobart Police Department's procedures in terms of the proper completion of the requisite forms and therefore, has not established that this was a proper inventory search. However, the Government also argues that the

11

automobile search exception to the prohibition against warrantless searches makes this search constitutionally permissible.

The Government argues that automobiles, by virtue of their "ready mobility," make "immediate intrusion necessary to prevent the destruction of evidence" as well as by "the individual's lesser expectation of privacy in a vehicle." *United States v. Zaharsky*, 580 F.3d 515, 522 (7th Cir. 2009) (citing *United States v. Washburn*, 383 F.3d 638, 641 (7th Cir. 2004)).

The officers at the scene articulated why they had probable cause for believing evidence of criminal activity would be found in Defendant's vehicle. Shaginaw testified that in 75 to 80% of the stops in which a driver slow rolled or reached around inside the vehicle during the stop he had discovered criminal activity. Both officers testified that they saw Stork reaching behind the passenger seat during the time he was driving in the Days Inn parking lot, and before the officers got to his vehicle doors. Both officers testified that Stork slow rolled to a stop approximately 75 yards into the Days Inn parking lot. The Days Inn parking lot video (Exhibit B) shows that approximately 9 to 14 seconds elapsed before Stork brought his car to a stop in the Days Inn parking lot. Stork admitted that he did not pull his vehicle over and stop on 62nd Street.

Automobile searches, including searches of containers within the vehicle, are permitted if officers have probable cause to believe they will find evidence of criminal activity. *United States v. Ross*, 456 U.S. 798, 102 S. Ct. 2157 (1982), *see also Arizona v. Gant*, 129 S. Ct. 1710, 1721 (2009). The evidence being sought need not be limited to evidence related to the criminal activity for which the defendant was arrested. *Id*. Here, the facts known to the officers at the time, that Mr. Stork had slow rolled following the activation of Officer Havens' lights and sirens, that Mr. Stork was seen reaching around the inside of the vehicle, in particular toward the passenger seat area

12

during the time he was slow rolling, combined with the officers' knowledge that those two activities were generally linked to criminal activity, are sufficient to establish probable cause for the automobile search. Accordingly, the search of Mr. Stork's vehicle was a constitutionally permissible automobile search and there is no reason to suppress any of the evidence recovered by the search.

    C) <u>Search incident to arrest</u>

The Fourth Amendment to the Constitution of the United States protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. Defendant argues that the search of Mr. Stork's vehicle was not incident to his arrest, as he was in handcuffs and in an ambulance when the search was conducted, and there was no basis to believe there was evidence of the underlying crime in the car, as the underlying crime was a traffic violation.

The Government asserts that it is not relying on the search incident to arrest exception to warrantless searches and hence this Court need not analyze the arguments raised by Defendant but will instead assume that the search was not incident to Stork's arrest for purposes of the Motion to Suppress and need not rule on whether suppression on that basis would be appropriate.

Because the initial stop was warranted, and evidence from the vehicle was obtained under a constitutionally valid automobile search, suppression is not warranted; therefore, the Court need not address Defendants' arguments as to the impropriety of the search as an inventory search.

**IV. Conclusion**

For the foregoing reasons, the Court **RECOMMENDS** that the District Court **DENY** Defendant's Motion to Suppress Evidence [DE 25].

This Report and Recommendation is submitted pursuant to 28 U.S.C. § 636(b)(1)(C). Pursuant to 28 U.S.C. § 636(b)(1), and since Defendant is a prisoner, proceeding *pro se*, the parties shall have twenty-one (21) days after being served with a copy of this Recommendation to file written objections thereto with the Clerk of Court. The failure to file a timely objection will result in waiver of the right to challenge this Recommendation before either the District Court or the Court of Appeals. *Willis v. Caterpillar, Inc.*, 199 F.3d 902, 904 (7th Cir. 1999); *Hunger v. Leininger*, 15 F.3d 664, 668 (7th Cir. 1994); *The Provident Bank v. Manor Steel Corp.*, 882 F.2d 258, 260-261 (7th Cir. 1989); *Lebovitz v. Miller*, 856 F.2d 902, 905 n.2 (7th Cir. 1988).

SO ORDERED this 9th day of February, 2022.

s/ John E. Martin
MAGISTRATE JUDGE JOHN E. MARTIN
UNITED STATES DISTRICT COURT

cc:   All counsel of record
      Defendant Stork, *pro se*